UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | | |
|---|---|---|---|
| NICOLE LYNN ESCOBAR, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| v. | ) | | CIVIL ACTION |
| | ) | | NO. 13-10186-JGD |
| CAROLYN W. COLVIN, Acting | ) | | |
| Commissioner of the Social Security | ) | | |
| Administration, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## MEMORANDUM OF DECISION AND
## ORDER ON CROSS-MOTIONS REGARDING
## <u>DENIAL OF SOCIAL SECURITY BENEFITS</u>

March 20, 2014

DEIN, U.S.M.J.

## I. <u>INTRODUCTION</u>

The plaintiff, Nicole Lynn Escobar ("Escobar"), has brought this action pursuant

to sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), in order to challenge the final decision of the Commissioner of the Social

Security Administration (the "Commissioner") denying her claim for Social Security

Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits. The

matter is presently before the court on the "Plaintiff's Motion for Judgment" (Docket

No. 11), by which the plaintiff is seeking an order reversing the Commissioner's decision

and entering judgment in her favor, or in the alternative, remanding the matter to the

Social Security Administration for further administrative proceedings. It is also before

the court on the "Defendant's Motion to Affirm the Commissioner's Decision" (Docket No. 16), by which the Commissioner is seeking an order affirming her decision to deny Escobar's claims for benefits. At issue is whether the Administrative Law Judge ("ALJ"), in reaching her decision that Escobar was not disabled, erred by failing to conclude that the plaintiff has an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Social Security regulations, and by failing to properly evaluate the credibility of Escobar's subjective complaints of pain and other symptoms. Also at issue is whether the ALJ committed reversible error by failing to consider the severity of the plaintiff's impairments in combination, by failing to include all of Escobar's limitations in the hypothetical question that she posed to the vocational expert during the administrative hearing, and by finding that Escobar was not disabled under the social security regulations. For all the reasons described below, this court finds that the ALJ acted appropriately and that her decision was supported by substantial evidence in the record. Accordingly, the plaintiff's motion for judgment is DENIED, and the Commissioner's motion to affirm is ALLOWED.

## II.  STATEMENT OF FACTS[1]

Escobar was born on March 20, 1982, and was 29 years old at the time of her hearing before the ALJ.  (Tr. 36-37, 130).  She has a high school education and has been employed in a number of capacities, including but not limited to, as a counter clerk at a donut shop, a group sales coordinator at a restaurant, a dishwasher/bus girl at a restaurant, and a cashier at various retail establishments.  (Tr. 39-46, 156).  Escobar is currently married and has three school age children.  (Tr. 37, 53-54).  Although her mother presently has custody of the children due to issues involving the plaintiff's former boyfriend, Escobar has visitation rights and is able to see them weekly.  (Tr. 53-55).  She claims that none of her physical or mental impairments would render her incapable of caring for the children if she were to recover custody of them in the future.  (Tr. 55).

According to Escobar, she left her last job in the fall of 2008 due to family problems, difficulties with some of her co-workers, transportation issues and problems stemming from a heart condition known as hypertrophic cardiomyopathy.  (See Tr. 41-42, 240-41).  She claims that she has been disabled from working since that time as a result of her cardiomyopathy, hearing loss in both ears, a sleep disorder, asthma, and a number of mental health conditions, including bipolar disorder, post-traumatic stress disorder ("PTSD"), depression and anxiety.  (Tr. 35-36, 155).  At issue in this case is whether the ALJ's decision to reject Escobar's claims as to the severity of her conditions, and her

---

[1]  References to pages in the transcript of the record proceedings shall be cited as "Tr. __."  The ALJ's decision shall be cited as "Dec." and can be found beginning at Tr. 14.

conclusion that Escobar was not disabled from working during the time period from October 30, 2008 through the date of her decision on July 14, 2011, was supported by substantial evidence.

## **Procedural History**

Escobar filed applications for SSI and SSDI benefits on August 11, 2009, claiming that she had been unable to work since October 30, 2008[2] due to symptoms stemming from her heart condition and mental health impairments. (Tr. 130-43, 151, 155). Her applications were denied initially in December 2009, and upon reconsideration in May 2010. (Tr. 72-87).

The plaintiff subsequently requested and was granted a hearing before an ALJ, which took place by video teleconference on June 24, 2011. (Tr. 30-71, 88-98, 100-10). Escobar, who was represented by counsel, appeared and testified at the hearing. (Tr. 31-63, 65-67). Significantly, during her testimony, Escobar had an opportunity to describe the pain and other symptoms that she experiences as a result of her physical and mental impairments, the treatment she has received for her symptoms, and the extent to which that treatment has helped to relieve her symptoms. (Tr. 47-53, 59-63). Additionally, the ALJ asked Escobar to discuss any side effects that she experiences as a result of her

---

[2] Although the summaries of Escobar's applications for SSI and SSDI indicate that the plaintiff was claiming an inability to work since March 30, 2009, other evidence in the record, including the ALJ's decision, specify an alleged onset date of October 30, 2008. (Compare Tr. 130 and 137 with Tr. 14 and 155). Because the ALJ considered October 30, 2008 to be the alleged date of onset of Escobar's disability, and analyzed her claims on that basis, this court will do likewise.

medications, and to describe the impact that her physical and mental impairments have had on her ability to carry out day-to-day activities. (Tr. 53, 57-60). Accordingly, Escobar described how her physical and mental impairments have affected the quality of her sleep, as well as her ability to interact with her children, exercise, shop for groceries, and perform other activities of daily living. (Tr. 50, 54, 58-60). As described below, this court finds that the ALJ properly considered these matters in assessing the credibility of Escobar's claims of disabling pain and functional limitations.

During the hearing, the ALJ also elicited testimony from a vocational expert ("VE"), who described the plaintiff's vocational background based on her past work experience and responded to hypothetical questions designed to determine whether jobs exist in the national economy for an individual with the same age, educational back-ground, past work experience, and residual functional capacity ("RFC") as the plaintiff. (Tr. 63-70). Escobar contends that the hypothetical question, which the ALJ posed to the VE, did not accurately reflect all of the plaintiff's functional limitations, and that therefore, the ALJ's reliance on the VE's response to that question was not based on substantial evidence. For the reasons detailed below, however, this court concludes that the ALJ's question was appropriate, and that the ALJ was entitled to rely on the VE's response to support her finding that Escobar was not disabled.

Specifically, during the hearing, the ALJ asked the VE to consider a hypothetical individual with the same age, education and work experience as the plaintiff who retains the physical ability to perform light work, except that the individual would only be able

to stand and walk up to four hours per day; could occasionally climb, balance, stoop, kneel, crouch, and crawl; could never climb ropes, ladders or scaffolds; and would need to avoid concentrated exposure to extreme cold, noise, vibration, fumes, odors, dust, gases, and hazards such as machinery and heights.  (Tr. 67-68).  Additionally, with respect to the hypothetical individual's mental limitations, the ALJ stated that the individual "is limited to unskilled work with simple tasks, only occasional changes in the work [setting], only occasional judgment or decision making involving no interaction with the general public, and only occasional superficial interaction with co-workers." (Tr. 68).  The VE testified that such an individual would not be able to perform any of Escobar's past work, but that a claimant with those limitations would be able to perform general, unskilled factory work such as assembly inspecting, testing and hand packaging. (Id.).  He further provided specific examples of such work, including the jobs of electronics inspector, computer assembler, gauger, and eyeglass polisher.  (Tr. 68-69). According to the VE, there are about 4,000 such jobs in Massachusetts and about 200,000 such jobs in the national economy.  (Id.).

        After the VE responded to the ALJ's hypothetical question, the plaintiff's counsel was given an opportunity to examine the VE.  (Tr. 70).  Plaintiff's counsel asked the VE whether jobs would be available for a hypothetical claimant who had the same limitations as those described by the ALJ, but also had to call in sick once a month or come in late once a week due to her medical condition.  (Id.).  The VE testified that based on his professional experience, an employer likely would be willing to retain an individual who

called in sick or came in late six times over the course of a year, but that there would be no jobs available for the hypothetical claimant described by the plaintiff's attorney.  (Id.).

On July 14, 2011, the ALJ issued a decision denying Escobar's applications for benefits.  (Dec. 24; Tr. 24).  Subsequently, the plaintiff filed a request for review of the ALJ's decision by the Social Security Appeals Council, and on December 12, 2012, the Appeals Council denied the request, thereby making the ALJ's decision the final decision of the Commissioner for purposes of review.  (Tr. 1-3, 7).  Therefore, the plaintiff has exhausted all of her administrative remedies, and the case is ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## The ALJ's Decision

The ALJ concluded that from October 30, 2008 through the date of her decision on July 14, 2011, Escobar had not been "under a disability, as defined in the Social Security Act," which defines "disability" as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months."  (Dec. 1 and Finding #11; Tr. 14, 24).  See also 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  There is no dispute that the ALJ, in reaching her decision, applied the five-step sequential evalua-tion required by 20 C.F.R. §§ 404.1520 and 416.920.  The procedure resulted in the

following analysis, which is detailed in the ALJ's "Findings of Fact and Conclusions of Law." (See Dec. 3-11; Tr. 16-24).

The first inquiry in the five-step process is whether the claimant is "engaged in substantial gainful work activity[.]" Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). If so, the claimant is automatically considered not disabled and the application for benefits is denied. See id. In the instant case, the ALJ determined that Escobar had not engaged in such activity since October 30, 2008, the alleged onset date of her disability. (Dec. Finding #2; Tr. 16). Therefore, the ALJ proceeded to the next step in the sequential analysis.

The second inquiry is whether the claimant has a "severe impairment," meaning an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is considered not disabled and the application for benefits is denied. See Seavey, 276 F.3d at 5. Here, the ALJ concluded that Escobar suffered from a variety of severe impairments, including cardiomyopathy, obesity, asthma, depression, anxiety, and hearing loss. (Dec. Finding #3; Tr. 16).

In connection with her finding at step two, the ALJ provided a detailed description of the objective medical evidence relating to Escobar's physical and mental health conditions. (Dec. 4-6; Tr. 17-19). In particular, she discussed the findings of Escobar's treating physicians regarding the plaintiff's heart condition, including the results of septal myectomy surgery, which was performed on Escobar's heart in April 2010 to address the

plaintiff's complaints of symptoms from her cardiomyopathy. (Dec. 4-5; Tr. 17-18; <u>see also</u> Tr. 329-30, 450-52). The ALJ also described the findings of Escobar's mental health providers, who evaluated the plaintiff and provided her with counseling and psychopharmaceutical treatment during the time period from July 2009 through April 2011. (Dec. 4-5; Tr. 17-18). In addition, the ALJ reviewed the results of audio testing relating to the plaintiff's hearing loss, and described certain testimony that Escobar had given at the hearing, including testimony pertaining to her weight and to certain of her physical and mental conditions. (Dec. 6; Tr. 19). Because the ALJ determined that Escobar suffered from a number of severe impairments, she proceeded to step three in the sequential analysis.

The third inquiry is whether the claimant has an impairment equivalent to a specific list of impairments contained in Appendix 1 of the Social Security regulations, in which case the claimant would automatically be found disabled. <u>See</u> <u>Seavey</u>, 276 F.3d at 5; 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At this step, the ALJ concluded that Escobar's impairments, either alone or in combination, did not meet or medically equal any of the listed impairments. (Dec. Finding #4; Tr. 19).

<u>Details Regarding the ALJ's Step Three Analysis</u>

In reaching her conclusion at step three, the ALJ reviewed the entire record, including the testimony and other evidence presented by the plaintiff. (Dec. 6; Tr. 19). She determined, based on her review, that "[n]one of the claimant's impairments rise to the level of severity needed to meet or equal a listing level." (<u>Id.</u>). Moreover, in her

written decision, the ALJ specifically addressed whether Escobar's mental impairments, considered singly or in combination, met or medically equaled the criteria of Listing 12.04 for affective disorders or Listing 12.06 for anxiety-related disorders. (Id.). The ALJ concluded that the plaintiff's mental impairments did not meet or medically equal either of these Listings. (Dec. 6-7; Tr. 19-20).

In support of this finding, the ALJ considered whether the so-called "paragraph B" criteria of Listings 12.04 and 12.06 were satisfied. (Dec. 6; Tr. 19). The ALJ recognized that in order to meet the paragraph B criteria of either Listing,

> the [plaintiff's] mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

(Id.). She then determined that Escobar's mental impairments did not satisfy the applicable criteria because the plaintiff had experienced no extended episodes of decompensation, and because the plaintiff had only mild restrictions in her ability to carry out daily activities, moderate difficulties in social functioning, and moderate difficulties with regard to concentration, persistence or pace. (Dec. 6-7; Tr. 19-20). The parties dispute whether these findings were supported by substantial evidence.

The ALJ also considered whether the plaintiff's mental impairments satisfied the so-called "paragraph C" criteria of Listing 12.04 and/or 12.06. (Dec. 7; Tr. 20). Because

-10-

the ALJ found that Escobar was capable of traveling independently in the community, taking public transportation, and keeping medical appointments by herself, she concluded that the evidence failed to satisfy the paragraph C criteria for either Listing.  (Id.).  As described below, the plaintiff does not take issue with the ALJ's finding on this point.

## The Step Four Analysis

Because the ALJ determined that Escobar's impairments did not meet or equal any of the listed impairments, her analysis continued.  The fourth inquiry asks whether "the applicant's 'residual functional capacity' is such that he or she can still perform past relevant work[.]"  Seavey, 276 F.3d at 5.  In the instant case, the ALJ determined as follows with respect to Escobar's RFC:

> After careful consideration of the entire record, I find that the claim-
> ant has the residual functional capacity to perform light work as
> defined in 20 CFR 404.1567(b) and 416.967(b)[3] except stand/walk
> for four hours per day.  She can occasionally climb, balance, stoop,
> kneel, crouch, or crawl.  She can never climb ropes, ladders or
> scaffolds.  She must avoid concentrated exposure to extreme cold,
> noise, vibration, fumes, odors, dusts, gases, and hazards such as
> machinery and heights.  She is limited to unskilled work with simple
> tasks.  She can have only occasional changes in the work setting.
> She can have only occasional judgment or decision-making.  She can

---

[3]  20 C.F.R. §§ 404.1567(b) and 416.967(b) define "light work" as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."

have no interaction with the general public and only occasional, superficial interaction with co-workers.

(Dec. Finding #5; Tr. 20). This was the same RFC that was included in the ALJ's hypothetical question to the VE. (See Tr. 67-68). Escobar contends that this finding is not supported by substantial evidence because the ALJ did not properly evaluate her subjective complaints of pain and other symptoms. However, this court finds, for the reasons described below, that the ALJ's credibility assessment was appropriate and does not warrant a reversal or remand of the matter for further consideration by the Social Security Administration.

In reaching her conclusion regarding Escobar's RFC, the ALJ followed well-established procedures. Thus, the ALJ first considered all of the plaintiff's symptoms and the extent to which those symptoms were consistent with the objective medical evidence and other evidence in the record. (Dec. 7; Tr. 20). Because the ALJ determined that Escobar's medically determinable impairments could reasonably be expected to cause the plaintiff's alleged symptoms, she went on to determine whether the plaintiff's subjective statements about her pain and other symptoms were credible in light of the entire record. (Dec. 7-8; Tr. 20-21). The ALJ concluded that in this case, "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." (Dec. 8; Tr. 21).

In connection with her assessment of Escobar's credibility, the ALJ first determined that the plaintiff's activities of daily living were "essentially intact," that the plaintiff was capable of caring for herself, and that she could act in her own self interest. (Id.). In particular, the ALJ noted that Escobar visited and played with her children, had recently gotten married, could prepare simple meals, enjoyed watching television, and was able to take short walks. (Id.). Thus, the ALJ did not credit Escobar's claim that her impairments significantly interfered with her ability to carry out day-to-day activities.

The ALJ also found that the plaintiff's impairments, while severe, had responded to treatment, and that the plaintiff's alleged limitations were not fully supported by the medical evidence. (See id.). Specifically, the ALJ found that while the record supported the plaintiff's history of cardiomyopathy, the condition was initially treated with medication and Escobar's treating cardiologist believed her to be low risk. (Dec. 4, 8; Tr. 17, 21). She also found that although Escobar continued to have some episodes of dizziness, as well as some mild dyspnea when walking up hills following her heart surgery, her cardiologist considered the surgery successful, and the plaintiff reported an eighty percent improvement in her symptoms. (Dec. 8; Tr. 21). The ALJ further noted that the plaintiff's EKG following her surgery showed normal sinus rhythm. (Id.).

With respect to the plaintiff's asthma, the ALJ found that there was no medical evidence showing that the condition was severe enough to preclude all employment. (Id.). She also found that Escobar's hearing loss was no more than moderate and could be treated with hearing aids. (Id.). The ALJ did acknowledge that Escobar was obese.

(Id.).  However, the plaintiff had testified that her weight fluctuated, and the ALJ believed that losing weight would ease both her cardiac and respiratory issues.  (Id.).

With respect to the plaintiff's mental health impairments, the ALJ found it significant that the record established a history of non-compliance with treatment.  (Dec. 9; Tr. 22).  For instance, the ALJ noted that in 2007, the plaintiff's counseling sessions were terminated due to a lack of consistency.  (Id.).  There also was evidence showing that at one point, Escobar had stopped seeing her psychiatrist and had ceased taking her prescribed medication.  (Id.).  The ALJ found that when Escobar complied with her treatment, the objective medical evidence showed that she could understand, remember and carry out simple tasks, interact occasionally with co-workers, tolerate occasional changes in the workplace, and had some ability to make judgments and decisions.  (Id.).  Indeed, records from one of Escobar's treating therapists indicated that the plaintiff was able to complete tasks when they were broken down, had no difficulties travelling in public, and could function acceptably despite routine stress.  (Id.).  Accordingly, the ALJ determined that the plaintiff's subjective complaints were only credible to the extent that they were consistent with her finding as to the plaintiff's RFC.  (See Dec. 8; Tr. 21).

After describing the basis for her conclusion regarding Escobar's credibility, the ALJ discussed the opinion evidence that she had considered in determining Escobar's RFC, as well as the weight that she had given to the assessments of the physicians and mental health professionals who had examined the plaintiff or provided opinions based on a review of Escobar's medical records.  (Dec. 8-9; Tr. 21-22).  With respect to the

-14-

plaintiff's mental impairments, the ALJ acknowledged that Robert Cserr, M.D., a treating psychiatrist, had opined that the plaintiff was markedly limited in her ability to handle complex tasks, in her ability to interact appropriately with co-workers, and in her ability to respond appropriately to usual work situations and to changes in the routine work setting.  (Dec. 9; Tr. 22).  The ALJ explained that she had considered Dr. Cserr's opinion on these matters, and had noted that they were based upon Escobar's reporting rather than on his own objective findings.  (Id.).  She also determined that Dr. Cserr's opinion was inconsistent with his own finding that Escobar responded favorably to psychopharmacological treatment.  (Id.).  Accordingly, the ALJ did not credit Dr. Cserr's assessment to the extent it was inconsistent with her determination regarding the plaintiff's mental RFC.  (See id.).

The ALJ further acknowledged that Elisa Farias, MSW, a treating therapist, had assessed Escobar as having a Global Assessment of Functioning ("GAF")[4] score of 50 (id.), which indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Amaral v. Comm'r of Soc. Sec., 797 F. Supp. 2d 154, 158 n.1 (D. Mass. 2010) (quoting Am. Psychiatric Ass'n, Diagnostic &

---

[4] "The GAF scale is a numeric scale ranging from 0 to 100 and is used by mental health clinicians to rate the social, occupational, and psychological functioning of adults.  The higher the score, the better the individual is deemed to cope with a wide range of activities."  Snow v. Barnhart, Civil Action No. 05-11878-RGS, 2006 WL 3437400, at *2 n.3 (D. Mass. Nov. 29, 2006).

Statistical Manual of Mental Disorders 34 (4th ed., text rev. 2000)).  However, the ALJ found that Ms. Farias, a social worker, is not considered an acceptable medical source by the Social Security Administration, and that her GAF rating was not supported by Escobar's treatment records, which revealed a higher level of functioning when the plaintiff was compliant with her psychiatric treatment and medication.  (Dec. 9; Tr. 22). In particular, the ALJ found that records from Ms. Farias' office reflected concern that Escobar was seeking medication without following through on other areas of treatment. (Dec. 5; Tr. 18; see also Tr. 488).  She also pointed out that in her records, Ms. Farias had stated that overall, Escobar appeared stable with normal levels of anxiety regarding her fiance's surgery.  (Dec. 9; Tr. 22; see also Tr. 482).  Therefore, the ALJ explained that she was giving greater weight to the treating mental health records than to Ms. Farias' opinion regarding the plaintiff's GAF rating.  (Dec. 9; Tr. 22).

The ALJ stated that she was giving significant weight to the mental RFC assessments that had been completed by the non-examining state agency consultants, Carol A. McKenna, Ph.D. and Henry Schniewind, M.D.  (Id.).  Those assessments indicated that the plaintiff remained capable of performing simple jobs without complex instructions, and jobs that do not require working closely with others.  (See Tr. 324, 394).  The ALJ found that these opinions were consistent with evidence in the record, and were supported by the record as a whole.  (Dec. 9; Tr. 22).

With respect to the plaintiff's physical impairments, the ALJ accepted the view of Martin S. Maron, M.D., one of Escobar's treating cardiologists, that the surgery for

Escobar's cardiomyopathy had proved successful. (Id.). She also gave significant weight to the physical RFC assessments that were completed by two state agency consultants, Mark Colb, M.D. and Rosario Palmeri, M.D. (Id.; see also Tr. 290-97, 398-405). Both consultants determined that Escobar retained the capacity to perform work at a light level of exertion. (See id.). The ALJ found that both of these opinions were supported by the record as a whole. (Dec. 9; Tr. 22). Therefore, the ALJ concluded that while "the combined impact of the claimant's physical and mental impairments [were] severe and limiting[,]" Escobar remained capable of functioning at the level set forth in her finding regarding the plaintiff's RFC. (Dec. 10; Tr. 23).

After explaining the basis for her RFC, including the basis for her assessment that the plaintiff's statements regarding her symptoms were not entirely credible, the ALJ concluded that Escobar was unable to perform her past relevant work. (Dec. Finding #6; Tr. 23). Consequently, the ALJ reached the fifth and last step in the sequential analysis.

## The ALJ's Decision at Step Five

The fifth inquiry is whether, given the claimant's RFC, education, work experience and age, the claimant is capable of performing other work. See Seavey, 276 F.3d at 5; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If so, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 416.920(g). At step five, the Commissioner has the burden "of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Seavey, 276 F.3d at 5. In the instant case, the ALJ recognized that "[i]f the claimant had the [RFC] to perform the full range of light work, a

finding of 'not disabled' would be directed by Medical-Vocational Rule 202.21."[5]  (Dec.

10; Tr. 23).  However, because the ALJ determined that Escobar's ability to perform all

or substantially all of the requirements of light work had been eroded by additional

limitations, she relied on the testimony of the VE to determine whether jobs exist in the

national economy for an individual with Escobar's age, education, prior work experience

and RFC.  (Dec. 10-11; Tr. 23-24).  Based on the VE's response to her hypothetical

question, the ALJ concluded that Escobar was capable of performing work that exists in

significant numbers in the national economy.  (Dec. 11; Tr. 24).  Accordingly, the ALJ

found that Escobar was not disabled.  (Dec. 11; Dec. Finding #11; Tr. 24).

Additional factual details relevant to this court's analysis are described below

where appropriate.

### III.  ANALYSIS

### A.    Standard of Review

Escobar is seeking judicial review of the Commissioner's "final decision" pursuant

to the Social Security Act § 205(g), 42 U.S.C. § 405(g) (the "Act").  The Act provides in

relevant part that:

> Any individual, after any final decision of the Commissioner of
> Social Security made after a hearing to which he was a party,
> irrespective of the amount in controversy, may obtain a review of
> such decision by a civil action .... The court shall have power to

---

[5]  Rule 202.21 provides guidance for evaluating the capabilities of a younger individual
with at least a high school education and non-transferable job skills to perform "light work."  20
C.F.R. Pt. 404, Subpt. P, App. 2, § 202.21.

> enter, upon the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the Commissioner
> of Social Security, with or without remanding the cause for a re-
> hearing.  The findings of the Commissioner of Social Security as to
> any fact, if supported by *substantial evidence*, shall be conclusive ....

42 U.S.C. § 405(g) (emphasis added).  The Supreme Court has defined "substantial

evidence" to mean "more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  Richardson

v.Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting

Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126

(1938)); accord Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st

Cir. 1991).

> It has been explained that:

> > In reviewing the record for substantial evidence, we are to keep in
> > mind that "issues of credibility and the drawing of permissible
> > inference from evidentiary facts are the prime responsibility of the
> > [Commissioner]."  The [Commissioner] may (and, under his
> > regulations, must) take medical evidence.  But the resolution of
> > conflicts in the evidence and the determination of the ultimate
> > question of disability is for him, not for the doctors or for the courts.
> > We must uphold the [Commissioner's] findings in this case if a
> > reasonable mind, reviewing the record as a whole, could accept it as
> > adequate to support his conclusion.

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981) (quoting

Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  Thus,

"the court's function is a narrow one limited to determining whether there is substantial

evidence to support the [Commissioner's] findings and whether the decision conformed

to statutory requirements." Geoffroy v. Sec'y of Health & Human Servs., 663 F.2d 315, 319 (1st Cir. 1981). The Commissioner's decision must be affirmed, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).

"Even in the presence of substantial evidence, however, the Court may review conclusions of law, and invalidate findings of fact that are 'derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts[.]'" Musto v. Halter, 135 F. Supp. 2d 220, 225 (D. Mass. 2001) (quoting Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam)) (internal citations omitted). "Thus, if the ALJ made a legal or factual error, the court may reverse or remand such decision to consider new, material evidence or to apply the correct legal standard." Ross v. Astrue, Civil Action No. 09-11392-DJC, 2011 WL 2110217, at *2 (D. Mass. May 26, 2011) (internal citation omitted).

## B.    Absence of a Listed Impairment

The plaintiff argues that the Commissioner's decision to deny her claim for SSI and SSDI benefits must be reversed because the ALJ's determination that her impairments did not meet or medically equal a listed impairment was not supported by substantial evidence. (Pl. Mem. (Docket No. 11-1) at 5-8). At step three of the disability analysis "it is the claimant's burden to show that [s]he has an impairment or impairments which meets or equals a listed impairment in Appendix 1" of the social security regulations. Torres v. Sec'y of Health & Human Servs., 870 F.2d 742, 745 (1st Cir. 1989).

"An impairment meets the listings only when it manifests the specific findings described in the set of medical criteria for a particular listed impairment." <u>Martinez Nater v. Sec'y of Health & Human Servs.</u>, 933 F.2d 76, 77 (1st Cir. 1991) (quotations and citation omitted). "An impairment equals a listed impairment when the set of symptoms, signs and laboratory findings in the medical evidence supporting the claimant are at least equivalent in severity to the set of medical findings for the listed impairment." <u>Id.</u> (quotations and citation omitted). In the instant case, Escobar has not shown how her impairments satisfy either of these requirements. Therefore, she has not established that the ALJ erred at step three of the sequential analysis.

### <u>Plaintiff's Mental Impairments</u>

Escobar argues that her mental health conditions met or equaled Listing 12.04, which covers affective disorders, and Listing 12.06, which covers anxiety-related disorders. (Pl. Mem. at 5-7). In order to satisfy Listing 12.04, Escobar had the burden of showing that the severity of her condition satisfied the criteria set forth in both paragraphs A and B of the Listing (the "paragraph A" and "paragraph B" criteria), or the criteria set forth in paragraph C of the Listing (the "paragraph C" criteria). 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04 ("The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied"). Similarly, in order to satisfy Listing 12.06, Escobar had the burden of showing that the severity of her condition satisfied both the paragraph A criteria and the paragraph B criteria, or both the paragraph A criteria and the paragraph C criteria. 20

C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06 ("The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied"). However, the plaintiff has not taken issue with the ALJ's determination that her mental impairments "fail[ed] to establish the presence of the 'paragraph C' criteria" (Dec. 7; Tr. 20), and she has not attempted to explain how her mental impairments satisfied the paragraph A criteria of either Listing. Therefore, she has failed to show that the ALJ erred by finding that her mental impairments did not meet or equal either of these Listings. See Torres, 870 F.2d at 745 (finding that claimant did not satisfy his burden of showing that his impairment met or medically equaled a listing for sensory impairments where, on appeal, "the claimant present[ed] no substantive argument indicating how he, allegedly, does meet a sensory impairment as listed in Appendix 1" of the social security regulations); Perez v. Astrue, Civil Action No. 11-30074-KPN, 2011 WL 6132547, at *3 (D. Mass. Dec. 7, 2011) (finding that plaintiff failed to show that ALJ erred at step three where plaintiff pointed "to no evidence in the record . . . which indicates that his impairments reach listing-level severity").

Even assuming, *arguendo*, that Escobar were able to satisfy the paragraph A criteria of one or both Listings, she has not shown that her mental impairments satisfy the paragraph B criteria for affective disorders or anxiety-related disorders. As described in the ALJ's decision, in order to make such a showing, the claimant must establish that her condition results in at least two of the following: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked

difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration[.]"  20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04 and 12.06.  The ALJ concluded that Escobar had experienced no episodes of decompensation of an extended duration.  (Dec. 7; Tr. 20).  She also concluded that Escobar had only mild restriction in her activities of daily living, and moderate difficulties in social functioning and with regard to concentration, persistence or pace.  (Dec. 6-7; Tr. 19-20).  Therefore, she found that the paragraph B criteria were not satisfied. (Dec. 7; Tr. 20).

Escobar does not dispute the ALJ's finding that she had no extended periods of decompensation, but she argues that the ALJ's analysis was flawed because it ignored the opinion of her treating psychiatrist, Dr. Cserr, that the plaintiff had marked difficulties in certain areas of mental functioning.  (Pl. Mem. at 5-6).  The record shows that on April 21, 2011, Dr. Cserr filled out a "Medical Source Statement of Ability to do Work-Related Activities (Mental)" in which he assessed Escobar as having marked restrictions in her ability to understand, remember and carry out complex instructions, marked limitations in her ability to interact appropriately with co-workers, and marked restrictions in her ability to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 496-98).  Escobar contends that this evidence indicates that her psychiatric condition met the requirements of Listings 12.04 and 12.06.  (Pl. Mem. at 5-6).

This court finds that Dr. Cserr's opinion is not sufficient to establish that Escobar's mental condition satisfied the paragraph B criteria, much less met or medically

equaled the specified Listings.  As an initial matter, Dr. Cserr did not address Escobar's

activities of daily living, and his assessment does not undermine the ALJ's determination

that she had mild restrictions in that area.  (See Tr. 496-98).  Additionally, although Dr.

Cserr opined that Escobar had marked limitations in her ability to interact with co-

workers, he also indicated that she had only moderate limitations in her ability to interact

appropriately with the public and no limitations in her ability to interact appropriately

with supervisors.  (Tr. 497).  Therefore, his opinion does not establish that she had

marked limitations in her overall ability to function socially.

Dr. Cserr's opinion also does not necessarily undermine the ALJ's determination

that Escobar had only moderate difficulties with respect to concentration, persistence or

pace.  In the first place, the form that Dr. Cserr filled out did not directly address those

areas of mental functioning.  (See Tr. 496-98).  Secondly, while Dr. Cserr indicated that

Escobar would have marked limitations with respect to complex instructions and marked

difficulties responding appropriately to usual work situations and changes in the routine

work setting, he opined that she would have no difficulties in understanding, remember-

ing and carrying out simple instructions, and no limitations in her ability to make simple

work-related decisions.  (Id.).  Accordingly, Dr. Cserr's opinion does not directly conflict

with the ALJ's conclusion that Escobar had only moderate limitations in concentration,

persistence or pace.

In any event, the ALJ stated that while she had considered Dr. Cserr's opinion, she

was not crediting it to the extent it conflicted with her finding regarding the plaintiff's

mental RFC.  (Dec. 9; Tr. 22).  Her decision in this regard was supported by substantial evidence.  "The law in this circuit does not require the ALJ to give greater weight to the opinions of treating physicians."  Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004) (quoting Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991)).  Thus, "'[c]ontrolling weight' is typically afforded a treating physician's opinion on the nature and severity of an impairment where it . . . 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence' in the claimant's case."  Id. (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).  Nevertheless, the ALJ is entitled to "downplay the weight afforded a treating physician's assessment of the nature and severity of an impair-ment where . . . it is internally inconsistent or inconsistent with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians."  Id.

Here, the ALJ found, and the record shows, that Dr. Cserr's opinions were based on Escobar's own reporting rather than on any objective observations or medically acceptable diagnostic techniques.  (See Dec. 9; Tr. 22; see also Tr. 496-97).  This fact alone was sufficient to justify the ALJ's decision to give it less weight.  See Colon v. Astrue, Civil Action No. 11-30078-GAO, 2012 WL 4106764, at *5 (D. Mass. Sept. 19, 2012) (finding no error in ALJ's decision to assign little weight to opinion of examining psychiatrist where "many of his findings were based on the plaintiff's claims, not on medical signs or laboratory findings").  In addition, Dr. Cserr's assessment as to the

severity of Escobar's mental impairments was inconsistent with his own treatment records, in which he stated that Escobar was "doing very well on her meds" and that she had no complaints or side effects other than some tiredness. (Tr. 470-71). Such evidence further supports the ALJ's decision to downplay Dr. Cserr's opinion. See Arruda, 314 F. Supp. 2d at 73 (finding that ALJ's decision to give little evidentiary weight to treating physician's opinion was justified where physician's RFC assessment was inconsistent with his treatment notes).

Even if Dr. Cserr's assessment could be read as satisfying the paragraph B criteria of Listings 12.04 and 12.06, it was inconsistent with other evidence in the record, such as the opinions of the two state agency consultants, Dr. McKenna and Dr. Schniewind, and did not have to be credited above these consultants' conclusions. Both of them found that Escobar's mental impairments did not meet or medically equal a listed impairment. (See Tr. 308-321, 384-397). They also assessed Escobar as having only mild restrictions with respect to activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace. (See Tr. 318, 394). The ALJ was entitled to rely on these assessments and not fully credit Dr. Cserr's assessment as to the extent of the plaintiff's mental limitations.[6]

---

[6] The plaintiff insists that the opinions expressed by Dr. McKenna and Dr. Schniewind are "speculative" and should not have been given significant weight. (Pl. Mem. at 11). This assertion is not supported by the record. As demonstrated by the consultant's notes contained in the Psychiatric Review Technique forms that were completed by Drs. McKenna and Schniewind, the state agency consultants conducted a careful review of the available records pertaining to Escobar's mental health, and rendered their opinions on the basis of that evidence. (See Tr. 320,

The plaintiff also asserts that the ALJ's findings regarding the severity of her mental impairments were inconsistent with the opinion of Escobar's treating therapist, Elisa Farias, MSW, that the plaintiff had a GAF score of 50. (Pl. Mem. at 6-7). This argument too is unpersuasive. "The GAF scale is intended for use by practitioners in making treatment decisions . . . and neither Social Security regulations nor case law require an ALJ to determine the extent of an individual's mental impairment based solely on a GAF score." Chanbunmy v. Astrue, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008) (quoting Parsons v. Astrue, 2008 WL 539060, at *7 (N.D. Fla. Feb. 22, 2008)). "In fact, the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.' See 65 Fed. Reg. 50746-01, 50764-65, 2000 WL 1173632 (August 21, 2000)." Id. (quoting Parsons, 2008 WL 539060, at *7). Thus, while "[a] GAF of 41-50 generically indicates serious symptoms . . . OR any serious impairment in social, occupational, or school function-ing[,] [a] raw GAF score of 50, without more, does not give a fact finder significant insight into whether [a claimant] can perform some type of competitive work." Querido

_____

396). Thus, there was nothing speculative or improper about their assessments, and it was entirely appropriate for the ALJ to rely on them. See Monroe v. Barnhart, 471 F. Supp. 2d 203, 211 (D. Mass. 2007) (explaining that hearing officer is entitled to adopt the opinion of a non-examining source). It was also appropriate for the ALJ to give greater weight to the opinions of Dr. McKenna and Dr. Schniewind than to the opinion of Dr. Cserr in light of the fact that the ALJ provided "good reasons" for giving limited weight to the treating source opinion. See Amaral, 797 F. Supp. 2d at 162 (explaining that opinions of non-examining sources may be given more weight than opinions of treating sources where the ALJ provides "good reasons" for his decision not to adopt the examining source opinions).

v. Barnhart, 344 F. Supp. 2d 236, 246 (D. Mass. 2004) (quotations, citation and footnote omitted).  See also Chanbunmy, 560 F. Supp. 2d at 383 ("A GAF score, without evidence that it impaired the ability to work, does not establish an impairment." (citations omitted)).  Escobar's suggestion that Ms. Farias' GAF rating establishes the existence of a listed impairment has no support in the Social Security regulations or in the relevant case law.

In any event, the ALJ expressly declined to credit Ms. Farias' opinion regarding the severity of Escobar's mental impairments.  (See Dec. 9; Tr. 22).  As the ALJ explained in her decision, clinical social workers like Ms. Farias are not considered "acceptable medical source[s]" whose opinions are entitled to controlling weight under the treating physician rule.  Courtemanche v. Astrue, No. CA 10-427M, 2011 WL 3438858, at *17 (D.R.I. Jul. 14, 2011).  See also 20 C.F.R. §§ 404.1513(a), 416.913(a). In addition, the ALJ found that the GAF rating "does not appear to be well supported by the claimant's treatment records, which support a higher level of functioning when she is compliant with treatment and medication."  (Dec. 9; Tr. 22).  For instance, the ALJ noted that in her treatment notes, Ms. Farias stated that overall, the plaintiff was "presenting as stable with normal levels of anxiety about her fiancé's surgery."  (Id.; see also Tr. 482). She also cited to a medical report from Joshua Golden, M.D., indicating that medication had been helpful in treating Escobar's bipolar disorder, sleeping problems, depression and mood swings.  (Dec. 5; Tr. 18; see also Tr. 326).  Consequently, the ALJ decided to give more credit to the treating mental health records than to Ms. Farias' opinion.  (Dec.

9; Tr. 22). "[T]he resolution of conflicts in the evidence and the drawing of conclusions from such evidence are for the [Commissioner,]" not the courts. <u>Irlanda Ortiz</u>, 955 F.2d at 769. Here, the ALJ gave good reasons for not crediting Ms. Farias' opinion, and that decision is entitled to deference.

Finally, the plaintiff suggests that her mental impairments are sufficiently severe to meet or medically equal Listings 12.04 and 12.06 because both of the state agency consultants confirmed the fact that she had been diagnosed with an affective disorder, an anxiety-related disorder, bipolar disorder, and PTSD. (Pl. Mem. at 7). Indeed, Dr. McKenna completed a Psychiatric Review Technique form ("PRTF") in which she confirmed that the plaintiff had been diagnosed with each of these mental impairments, and Dr. Schniewind completed a PRTF in which he confirmed the diagnoses of affective disorder and bipolar disorder. (<u>See</u> Tr. 308-21, 384-97). However, "[a] mere diagnosis of a condition 'says nothing about the severity of the condition.'" <u>White v. Astrue</u>, Civil Action No. 10-10021-PBS, 2011 WL 736805, at *6 (D. Mass. Feb. 23, 2011). <u>See also</u> <u>Colon</u>, 2012 WL 4106764, at *4 ("When assessing the effect of an impairment, the question is not whether the impairment exists at all but whether it is disabling, that is, whether it is sufficiently severe to prevent the plaintiff from working."). Therefore, the existence of several mental impairments does not undermine the ALJ's determination at step three of his analysis.

### Plaintiff's Physical Impairments

Escobar also contends that she suffers from a hearing loss, which meets a listed impairment under 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 § 2.00, and a heart condition, which meets a listed impairment under 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 § 4.00. Again, however, she has failed to explain how her conditions satisfy the requirements of a listed impairment or to point to any evidence supporting her position. Therefore, she has failed to establish that she is entitled to reversal or a remand on this basis.

The record shows that the plaintiff has been diagnosed with mild to moderate sensorineural hearing loss, which is slightly worse in the left ear. (See Tr. 201, 529-30). However, as described above, a diagnosis alone is insufficient to establish the severity of a condition. Furthermore, Section 2.00 of Appendix 1 contains three different listings relating to hearing loss. They include Listing 2.07 pertaining to "Disturbance of labyrinthine-vestibular function (including Ménière's disease);" Listing 2.10 pertaining to "Hearing Loss Not Treated With Cochlear Implantation;" and Listing 2.11 pertaining to "Hearing loss treated with cochlear implantation." Each of these Listings sets forth certain criteria that must be met in order to establish the existence of a per se disability. See 20 C.F.R. Pt. 404, Subpt. 1, App. 1 §§ 2.07, 2.10, 2.11. The plaintiff's failure to show how her hearing loss meets or medically equals the relevant criteria is fatal to her claim that her impairment is disabling per se. See Perez, 2011 WL 6132547, at *3 (plaintiff's failure to point to evidence in the record indicating that his impairments met listing level severity was fatal to his claim that the ALJ erred at step three in the disability analysis).

Escobar's claim that her heart condition meets or equals a listed impairment fares no better. The social security regulations recognize that "[t]here are various types of cardiomyopathy, which fall into two major categories: *Ischemic* and *nonischemic* cardiomyopathy[,]" and that hypertrophic cardiomyopathy, which is at issue in this case, is considered nonischemic. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 4.00(H)(3). The regulations further provide that the Commissioner "will evaluate cardiomyopathy under 4.02, 4.04, 4.05, or 11.04, depending on its effects on [the claimant]." Id. Each of those provisions has certain criteria that must be satisfied in order to meet the listing. See id. §§ 4.02, 4.04, 4.05, 11.04. Again, the plaintiff's failure to explain how the evidence satisfies any of the relevant criteria is fatal to her claim of error at step three in the ALJ's analysis.[7]

The plaintiff's assertion that her physical impairments met or equaled a listed impairment is also undermined by evidence from the state agency physicians that Escobar retained the physical RFC to perform light work. Specifically, the record shows that on

---

[7] Escobar argues that in her written decision, the ALJ failed to acknowledge that the plaintiff was referred to pain management for her chest pain following her heart surgery, and that she continued to experience symptoms from her heart condition in May 2011. (Pl. Mem. at 8). However, this argument does not explain how the plaintiff's heart condition satisfies any of the criteria of a listed impairment or undermines the ALJ's decision that her impairments did not meet or equal a listing. Furthermore, in her written decision, the ALJ did acknowledge that in May 2010, following her surgery, Escobar complained about some musculoskeletal discomfort. (Dec. 5; Tr. 18). She also acknowledged that in May 2011, Escobar was having mild dyspnea, especially when walking up hills or inclines, and reported to her cardiologist that she was having "some dizziness without palpitations, rapid heart rate, syncope, or near syncope." (Id.). Therefore, the ALJ did consider evidence showing that the plaintiff continued to experience symptoms relating to her heart condition even after her April 2010 surgery.

September 23, 2009, Dr. Colb completed an assessment of Escobar's physical RFC. (Tr. 290-97). Therein, Dr. Colb found that no limitations had been established in Escobar's ability to hear or speak. (Tr. 294). He also determined that Escobar retained the capacity to lift 20 pounds occasionally and 10 pounds frequently; to stand and/or walk for about 6 hours in an 8 hour work day; and to sit for about 6 hours in an 8 hour work day. (Tr. 291). Additionally, Dr. Colb concluded that Escobar had no limitations on her ability to push and/or pull; could occasionally crawl, crouch, kneel, stoop, balance, and climb ramps and stairs; could never climb ladders, ropes or scaffolding; had no manipulative or visual limitations; and should avoid concentrated exposure to extreme cold, noise, vibrations, fumes, and hazards such as machinery and heights. (Tr. 291-94). Dr. Colb's assessment of Escobar's RFC was consistent with an ability to perform light work. See 20 C.F.R. §§ 404.1567(b), 416.967(b) (defining "Light work" to include work that involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and "a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls"). Therefore, it supports the ALJ's conclusion that Escobar's physical impairments did not meet or medically equal a listing.

The record also shows that on May 4, 2010, Dr. Palmeri completed a physical RFC assessment based on a review of the plaintiff's medical records. (Tr. 398-405). Dr. Palmeri's assessment was generally consistent with Dr. Colb's assessment, except that Dr. Palmeri found that Escobar had the capacity to stand and/or walk for about 4

hours in an 8 hour work day, and had fewer postural and environmental restrictions.

(Compare Tr. 290-97 with Tr. 398-405). Like Dr. Colb, Dr. Palmeri determined that no

communicative limitations had been established, notwithstanding Escobar's hearing loss.

(Tr. 402). Additionally, his conclusions supported the ALJ's findings that Escobar could

perform a limited range of light work, as described in her assessment of the plaintiff's

RFC, and that Escobar's physical limitations did not render her per se disabled.

### C. Adequacy of the ALJ's Credibility Determination

The plaintiff next argues that the ALJ's assessment of her credibility is not

supported by substantial evidence because the ALJ failed to apply the so-called "Avery

factors" in deciding not to credit Escobar's complaints of disabling pain and other

symptoms. (Pl. Mem. at 8-9). Although the ALJ did not specifically list the Avery

factors in her written decision, this court finds that she fulfilled her obligation to consider

the relevant factors in connection with her credibility determination.

"The regulations recognize that a person's symptoms may be more severe than the

objective medical evidence suggests. Therefore, the regulations provide six factors

(known as the Avery factors) that will be considered when the applicant alleges pain" or

other symptoms.[8] Makuch v. Halter, 170 F. Supp. 2d 117, 126 (D. Mass. 2001) (internal

punctuation, emphasis, and citation omitted). These are:

---

[8] "While the Avery factors only discuss 'pain,' Social Security Ruling 96-7p makes it clear that the factors also apply to 'other symptoms.'" Amaral, 797 F. Supp. 2d at 162 n.3 (quoting SSR 96-7p, 1996 WL 374186, at *3).

> (1) the nature, location, onset, duration, frequency, radiation, and intensity of pain; (2) any precipitating or aggravating factors; (3) the type, dosage, effectiveness, and adverse side effects of any pain medication; (4) any treatment, other than medication, for the relief of pain; (5) any functional restrictions; and (6) the claimant's daily activities.

Rohrberg v. Apfel, 26 F. Supp. 2d 303, 308 (D. Mass. 1998) (citing Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986)).  While the ALJ must consider each of these factors, there is no requirement that she make specific findings regarding each of the factors in her written decision.  See 20 C.F.R. § 404.1529(c)(3) (listing Avery factors as factors that the Commissioner "will consider" in evaluating subjective complaints of pain and other symptoms).  See also Rand v. Barnhart, 357 F. Supp. 2d 361, 368 (D. Mass. 2005) ("While it may be argued that it would have been more helpful for the hearing officer explicitly to outline the *Avery* factors in making his credibility determination, it is sufficiently clear from the record that he thoroughly questioned [the claimant] according to those guidelines at the hearing[.]").

In the instant case, the ALJ satisfied her obligation to consider the relevant factors.  During the hearing, Escobar provided testimony regarding the intensity, persistence and limiting effects of her pain and other symptoms.  For example, but without limitation, Escobar described the pain she experiences in her lower back and chest as a result of her heart condition, as well as the impact that her heart-related symptoms have on her ability to sleep.  (Tr. 49-51).  She also explained that due to the progression of her hearing loss, she is unable to hear out of her left ear despite the use of hearing aids.  (Tr. 51).

Additionally, Escobar provided details as to how her mental health conditions effect her, including how they cause her to have mood swings, become argumentative, cry for no reason, and lose concentration. (Tr. 52, 62-63). She further explained that she experiences flashbacks and nightmares as result of her PTSD. (Tr. 61-62).

In addition to Escobar's testimony, the ALJ reviewed the medical records and considered complaints that the plaintiff had made to her treating physicians regarding the extent and limiting effects of her symptoms. For example, but again without limitation, the ALJ noted in her written decision that Escobar had complained to her cardiologists about chest pain, shortness of breath, fatigue, and difficulties walking up stairs or hills. (Dec. 4; Tr. 17). She also considered reports that Escobar had made to her mental health providers regarding her feelings of anxiety, stress, and fatigue, and the difficulties she experienced in maintaining positive social relationships. (Dec. 4-5; Tr. 17-18). As described above, the ALJ credited Escobar's claims to some extent, and found that she "does have impairments that more than minimally impair her ability to perform work-related activities." (Dec. 8; Tr. 21). However, the ALJ found that the plaintiff's complaints regarding the extent of her symptoms were undermined by medical evidence showing that she responded well to treatment, had a history of non-compliance with her mental health treatment, and was capable of functioning acceptably on a day-to-day basis. (See Dec. 4-5, 8-9; Tr. 17-18, 21-22).

With respect to the details of Escobar's treatment, the ALJ considered Escobar's testimony that she had not been able to obtain relief from her symptoms of cardiomy-

opathy with medication prior to her heart surgery, and that she had to resume medication even after her surgery due to continuing symptoms of chest pain and pressure, breathlessness, and fatigue. (Tr. 48-49). The ALJ also considered Escobar's testimony that she requires new hearing aids to compensate for continuing hearing loss, and that her psychiatric medications help "[a] little bit" and relieve some of her anxiety, but also make her tired and give her headaches. (Tr. 51-53). The ALJ found that Escobar's assertion that her treatment was not effective enough to enable her to perform work-related activities was inconsistent with objective medical evidence showing that her cardiologist considered her "low risk" with respect to her cardiomyopathy, that the plaintiff had been able to obtain some limited improvement for her heart-related symptoms from beta blocker therapy prior to her heart surgery, and that the plaintiff had reported an 80 percent improvement in her symptoms following her surgery. (Dec. 4-5; Tr. 17-18). The ALJ further found that Escobar's claim was inconsistent with evidence showing that the plaintiff had only mild to moderate hearing loss, and that she did well and presented as stable when she remained on her psychiatric medications and followed through with her mental health treatment. (Dec. 5-6, 8-9; Tr. 18-19, 21-22).

Finally, the record illustrates that the ALJ considered Escobar's statements about her activities of daily living, including her interactions with her children, other family members and friends, her participation in household chores, and her efforts to take walks for exercise. (Tr. 37-39, 52-55, 58-60). Not only did Escobar testify about these matters at the hearing, but the ALJ also addressed Escobar's ability to carry out such activities in

her written decision.  Therein, the ALJ determined that Escobar's "activities of daily living are essentially intact" and that she was able to care for her personal needs, take short walks, participate in the care of her children, prepare simple meals, and had recently gotten married.  (Dec. 6, 8; Tr. 19, 21).  Accordingly, the record demonstrates that the ALJ considered and applied the Avery factors in deciding not to fully credit Escobar's subjective complaints of disabling pain and other symptoms.

The plaintiff contends that in rendering her finding regarding Escobar's ability to perform daily activities, the ALJ disregarded statements that the plaintiff made at the hearing regarding her inability to prepare her own meals, drive a car, shop for food, or perform household chores.  (Pl. Mem. at 10).  According to the plaintiff, that evidence demonstrated that she was incapable of engaging in substantial gainful activity.  (Id.).  Thus, she contends that the ALJ's failure to credit her testimony amounted to reversible error.

Even assuming the plaintiff's assumption is correct, and that evidence of an inability to perform daily activities alone supports a claim of disability, her assertion that the ALJ erred in this regard is without merit.  While the plaintiff's hearing testimony may have supported a claim that she had significant limitations in her ability to carry out such activities, it was contradicted by other evidence in the record, including statements that Escobar provided in a Function Report that was filed in support of her claims for benefits.  In the Function Report, Escobar stated that she was able to perform housework, including making beds, cleaning dishes, sweeping floors and doing laundry.  (Tr. 164, 166).  She

also indicated that she had no difficulties with personal care, was able to prepare simple meals for herself on a daily basis, took short walks several times a week, sometimes went shopping, had no problems handling money, and enjoyed doing puzzles, crosswords, and watching television. (Tr. 165-68). Escobar further stated that she talked to her three children on the phone every night, visited them weekly, and played with them. (Tr. 168). In addition, during the hearing, Escobar testified that she has no physical or mental limitations that would prevent her from taking care of her children if she were to regain custody of them in the future. (Tr. 55). Therefore, the ALJ's finding with respect to Escobar's ability to perform activities of daily living was based on substantial evidence in the record, and supports her conclusion regarding the plaintiff's credibility.[9] See Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) ("evidence of daily activities can be used to support a negative credibility finding").

### D. Plaintiff's Challenge to the Step Five Analysis

Escobar also takes issue with the ALJ's finding at step five that there are a significant number of jobs in the national economy that the plaintiff is capable of performing.

---

[9] In connection with her challenge to the ALJ's credibility assessment, Escobar again argues that the ALJ erred by failing to credit Dr. Cserr's opinion that the plaintiff's mental health impairments met or medically equaled Listing 12.04 for affective disorders. (Pl. Mem. at 10-11). As described above, Dr. Cserr did not indicate that any of Escobar's mental impairments met or medically equaled a listed impairment, and his records do not support such a conclusion. Nor has the plaintiff presented any evidence that Escobar's physical impairments met or equaled any of the listed impairments.

For the reasons described below, this court finds the plaintiff's claims of error at this stage are unpersuasive, and concludes that the ALJ's finding must be upheld.

**<u>Combination of Impairments</u>**

The plaintiff contends that the ALJ improperly assessed each of Escobar's impairments separately instead of considering the combined impact of those impairments on her ability to perform work-related activities.[10]  (Pl. Mem. at 13-14).  "SSA regulations and case law mandate that the ALJ consider the combined effect of a claimant's impairments at each step of the sequential analysis."  <u>Snow</u>, 2006 WL 3437400, at *6.  The record establishes that the ALJ satisfied that requirement here.  As described in her written decision, the ALJ specifically recognized that in order to determine whether Escobar was disabled, she was obligated to evaluate whether the plaintiff was able "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment *or combination of impairments* that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months."  (Dec. 1; Tr. 14 (emphasis added)).  The ALJ also stated, at step three, that she had reviewed the entire record to determine "whether any physical or mental impairments, *or combination of impairments*," met or medically equaled a listed impairment.  (Dec. 6; Tr. 19 (emphasis added)).  Similarly, at step four, the ALJ express-

---

[10]  Although Escobar's argument that the ALJ failed to consider the combined impact of her impairments was raised in connection with her challenge to the ALJ's finding at step five, the argument appears to relate more generally to the ALJ's decision as a whole.

ly found "*the combined impact of the claimant's physical and mental impairments* to be severe and limiting" but also that *"the combined impact* results in her [RFC] to perform at the level set forth above."  (Dec. 10; Tr. 23 (emphasis added)).  Additionally, the ALJ's comprehensive discussion of Escobar's medical records, which is described in connection with her finding at step two, demonstrates "adequate consideration of the combined effect of [the] claimant's impairments despite the fact that the impairments are discussed individually rather than collectively."  <u>Snow</u>, 2006 WL 3437400, at *6.  Therefore, the plaintiff's claim of error on this issue is without merit.  <u>See</u> <u>Gooch v. Sec'y of Health & Human Servs.</u>, 833 F.2d 589, 591-92 (6th Cir. 1987) (the fact that the ALJ's decision was based on a review of the entire record, and that the ALJ specifically referred to "a combination of impairments" in deciding that the claimant did not meet the listings, demonstrated that the ALJ fulfilled his obligation to consider the combination of impairments, notwithstanding "the fact that each element of the record was discussed individually").

**<u>Hypothetical Question to the VE</u>**

Escobar also challenges the ALJ's reliance on the VE's testimony in rendering her decision at step five in her analysis, arguing that the hypothetical question that was posed to the VE did not reflect the most recent assessment from an expert regarding the plaintiff's physical RFC.  (Pl. Mem. at 16).  Specifically, according to the plaintiff, in 2010 Dr. Palmeri, one of the state agency consultants, "opined that the claimant would only be able to stand and/or walk for 2 hours of an 8 hour work day.  . . .  This report was the

most recent physical consultative report, however the ALJ chose to utilize the oldest

report conducted in 2009 by Dr. Mark Colb in formulating hypotheticals to the VE."

(Id.). Thus, the plaintiff asserts that the ALJ's decision to reject Dr. Palmeri's assessment

in favor of Dr. Colb's less recent assessment amounted to "clear error and abuse of

discretion by the ALJ." (Id.).

This court finds that the plaintiff's argument is based upon a misreading of

Dr. Palmeri's assessment and a misunderstanding of the ALJ's decision. In his RFC

assessment, Dr. Palmeri checked a box indicating that Escobar retained the capacity to

stand and/or walk for "*at least* 2 hours in an 8-hour workday[,]" but then specified in

writing that Escobar had the capacity to stand and/or walk for about 4 hours in an 8-hour

workday. (Tr. 399 (emphasis added)). The ALJ agreed, and incorporated that limitation

into the hypothetical that she posed to the VE at the hearing. (See Tr. 67-68). In doing

so, the ALJ rejected Dr. Colb's opinion that Escobar had the ability to stand and/or walk

for about 6 hours in an 8-hour workday. (See Tr. 291). Accordingly, the plaintiff's

assertion that the ALJ rejected Dr. Palmeri's opinion is belied by the administrative

record.

To the extent the ALJ credited Dr. Colb's opinions on other aspects of Escobar's

RFC, they were more restrictive, and thus more favorable to the plaintiff, than the

opinions expressed by Dr. Palmeri. For example, but without limitation, Dr. Palmeri

determined that Escobar had the capacity to climb ramps and stairs frequently, to climb

ladders, ropes and scaffolds occasionally, to stoop, kneel, crouch and crawl frequently,

and to balance occasionally. (Tr. 400). The ALJ rejected that assessment and deter-mined, consistent with Dr. Colb's opinion, that Escobar could occasionally climb, balance, stoop, kneel, crouch, or crawl, but that she could never climb ropes, ladders or scaffolds. (See Tr. 68, 292). Even if it were assumed that the ALJ erred by adopting Dr. Colb's opinions rather than Dr. Palmeri's more recent assessment, her decision to do so was more favorable to the plaintiff. Therefore, any error was harmless and does not warrant a reversal or remand of the matter to the Commissioner.

Escobar asserts that the ALJ's hypothetical question was improper in any event because the ALJ failed to "ask the VE to consider the 'mental demands of unskilled work.'" (Pl. Mem. at 18). This argument too is belied by the record. The Commissioner has explained that "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15 (S.S.A. 1985), 1985 WL 56857, at *4. During the hearing, the ALJ not only confirmed that the VE was familiar with the Social Security Administration's definition of unskilled work, but also specified that the hypothetical claimant would be "limited to unskilled work with simple tasks, only occasional changes in the work [setting], only occasional judgment or decision making involving no interaction with the general public, and only occasional superficial interaction with co-workers." (Tr. 63, 68). Therefore, the VE was specifically asked to consider the mental demands associated with unskilled work, as further limited by the

ALJ's description of the claimant's mental RFC. Therefore, the plaintiff's claim of error is without merit.[11]

## Application of Grid Rule 202.04

Finally, Escobar argues that even if the ALJ's description of her RFC were correct, Rule 202.04 of the Medical-Vocational Guidelines (the "Grid") would direct a finding of disability in her case. (Pl. Mem. at 18-19). Therefore, she contends that the ALJ erred at step five by failing to find her disabled. This court disagrees for the reasons that follow.

At step five, "the burden is on the [Commissioner] to demonstrate that there are jobs in the national economy that claimant can perform." Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991). "The Grid is designed to enable the [Commissioner] to satisfy this burden in a 'streamlined' fashion without resorting to 'the live testimony of vocational experts.'" Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989) (quoting Sherwin v. Sec'y of Health & Human Servs., 685 F.2d 1, 4 (1st Cir. 1982)). It "consists of a matrix of the applicant's exertional capacity, age, education, and work experience. If the facts of the applicant's situation fit within the Grid's categories,

_____

[11] To the extent Escobar claims that the ALJ should have relied on the VE's response to her counsel's hypothetical question rather than the VE's response to the ALJ's hypothetical question, she has failed to articulate a basis for her contention. (See Pl. Mem. at 15-16). As described above, Escobar's attorney asked the VE to assume that a hypothetical claimant who had the same limitations as those described by the ALJ would call in sick once a month or come in late once a week due to her medical condition. (Tr. 70). However, the plaintiff has not pointed to any specific evidence in the record to support her counsel's assumption regarding her rate of absenteeism. Therefore, she has not shown that the ALJ's decision not to rely on the VE's response to that question was in error.

the Grid 'directs a conclusion as to whether the individual is or is not disabled.'" <u>Seavey</u>, 276 F.3d at 5 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(a)).

The plaintiff recognizes that in cases such as this one, "where a claimant has nonexertional impairments in addition to exertional limits, the Grid may not accurately reflect the availability of jobs such a claimant could perform."[12] <u>Heggarty</u>, 947 F.2d at 996.  Thus, "[i]f the occupational base is significantly limited by a nonexertional impairment, the [Commissioner] may not rely on the Grid to carry the burden of proving that there are other jobs a claimant can do." <u>Id.</u> Ordinarily, under such circumstances, the "testimony of a vocational expert is required." <u>Id.</u>

There is no dispute that in the instant case, the plaintiff had significant nonexertional impairments that required the testimony of a VE at step five in the ALJ's analysis. Nevertheless, Escobar argues that the Grid directs a finding of disability.  She reasons that even if the ALJ had found that she could perform the full range of light work, without the additional limitations resulting from her nonexertional limitations, Rule 202.04 of the Grid would compel a finding of disability for someone of her age, educa-

---

[12]  Exertional limitations are those that "affect [an individual's] ability to meet the strength demands of jobs" including "strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling." 20 C.F.R. §§ 404.1569(a), 416.969(a).  Nonexertional limitations are ones "which affect [an individual's] ability to meet the demands of jobs other than the strength demands[.]" 20 C.F.R. §§ 404.1569a(a), 416.969a(a).  They include, but are not limited to, difficulty functioning due to nervousness, anxiety or depression, and "difficulty maintaining attention or concentrating[.]" 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

tion and past work experience. (Pl. Mem. at 19). Accordingly, she argues that the ALJ should have found her disabled and granted her request for benefits.

Again, the plaintiff's argument is unpersuasive. Although Grid Rule 202.04 does direct a finding of disability for an individual with a high school diploma and a history of no work or unskilled work, it applies to individuals of "advanced age," which is defined as individuals who are 55 or older. See 20 C.F.R. Pt. 404, Subpt. P., App. 2 § 202.04; 20 C.F.R. §§ 404.1563(e), 416.963(e)). Escobar, who was born in 1982 and was 29 years old at the time the ALJ issued her decision, is considered a younger individual under the regulations. See 20 C.F.R. §§ 404.1563(c), 416.963(c) (defining "younger person" as an individual under the age of 50). Pursuant to the Grid, a younger individual who has a high school diploma and can perform the full range of light work is not considered disabled notwithstanding the fact that the individual may have no prior work history or transferable skills. See 20 C.F.R. Pt. 404, Subpt. P., App. 2 §§ 202.20-202.22. Therefore, the plaintiff's assertion that there was no substantial evidence to support the ALJ's finding at step five must fail.

## IV.  CONCLUSION

For all the reasons detailed herein, the "Plaintiff's Motion for Judgment" (Docket No. 11) is DENIED and the "Defendant's Motion to Affirm the Commissioner's Decision" (Docket No. 16) is ALLOWED.

    / s / Judith Gail Dein
    Judith Gail Dein

U.S. Magistrate Judge